FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Jun 04, 2020

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| COLUMBIA AG GROUP, LLC, a Delaware limited liability company; and JAY GRAHAM, an individual,<br><br>　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>INTERNATIONAL FARMING CORPORATION, LLC, a Delaware limited liability company,<br><br>　　　　　　　　　Defendant. | NO:  1:18-CV-3235-RMP<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is a Motion for Summary Judgment brought by Plaintiffs Columbia Ag Group, LLC ("CAG") and Jay Graham's (collectively, "Plaintiffs"). ECF No. 24.  Defendant International Farming Corporation, LLC ("IFC") opposes the motion.  ECF No. 31.  Having reviewed the parties' filings related to the Motion for Summary Judgment, the remaining record, and the relevant law, the Court is fully informed.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 1

# BACKGROUND

*Factual Context*

The following facts are undisputed unless otherwise noted.

Graham is a Real Estate Managing Broker for CAG, a real estate firm based in Port Ludlow, Washington. ECF No. 25 at 2−3. IFC is a private investment manager based in Kinston, North Carolina, focusing on agribusiness assets. ECF Nos. 25-8 at 4; 26 at 2; and 36 at 2. In approximately May 2017, Graham called IFC's Pacific Northwest Sourcing Manager Toby McKay and, as recalled by McKay, told McKay that Graham "knew about two possible purchase and sale opportunities that he thought IFC would be interested in pursuing." ECF No. 32 at 2−3. At the time, Graham referred to the opportunities using the code names "Project Victory" and "Project Fuji" to maintain their confidentiality. *Id.* at 3. That summer, IFC and CAG executed nondisclosure agreements to discuss in limited detail and without identification of the businesses offered for sale in either project, the purchase opportunities. *Id.*

Also throughout summer 2017, McKay, on behalf of IFC, negotiated with Graham the terms of a brokerage contract. McKay recalls:

> Graham led me to believe that he and his firm would be working directly with the sellers and providing to IFC exclusive information that would not be available to anyone else to facilitate a purchase that would not be made available to other prospective buyers, meaning that the purchase would be "off market." Because of these assurances, IFC agreed to include a commission provision in the contract between the parties.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 2

ECF No. 32 at 4.

On approximately September 9, 2017, IFC, CAG, and Graham partially executed a "Buyer Agency Agreement" (the "Agreement"). ECF No. 25-1. Pursuant to the Agreement, IFC engaged CAG and Graham to act as its broker to purchase "property or business" of the following general nature: "[a]ny Washington State apple packing facility" priced between $20,000,000 and $150,000,000. ECF No. 25-1 at 4. The Agreement was finalized when CAG signed "Exhibit A" of the Agreement, which identified specific assets subject to the Agreement on September 11, 2017, and IFC added its signature on September 22, 2017. ECF Nos. 32 at 6−7; 33 at 2; and 36 at 2.

In the Agreement, IFC agrees to pay "a commission equal to three quarters of one percent (0.75%) of the purchase price of applicable business or property up to $75 Million and one-half of one percent (0.5%) of the purchase price of such applicable business or property if the applicable purchase price is greater than $75 million." ECF No. 25-1 at 2−3. The Agreement further provides that the "businesses and properties covered by this Agreement shall be the applicable properties or businesses purchased by [IFC] through the exclusive information provided by and efforts of [Graham] for a business or property is [sic] listed in Exhibit A attached hereto and incorporated herein by reference." *Id.* at 3.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 3

The Agreement does not define "exclusive information." ECF No. 25-1. Furthermore, although the information provided by Graham is to be "exclusive," the Agreement provides:

> [IFC] and all other applicable parties hereto agree and confirm that the relationship established by this Agreement is non-exclusive: [IFC] may use other brokers or third parties to locate property and to act as a broker or representative of [IFC]; and [Graham] and other brokers referenced hereunder may represent other buyers and/or sellers.

*Id.* at 3.

The Agreement defines the "Assistance" that Graham and CAG were to provide: "Graham and [CAG] shall advise [IFC] from time to time of properties and businesses that [Graham and CAG] can legally provide to [IFC] (respecting any confidentiality agreements executed by [CAG] or Graham), and counsel [IFC] on potential properties or businesses that might become available for purchase." ECF No. 25-1 at 3.

The Agreement provides that it began on September 1, 2017, and that it expired "at 11:59 p.m. on August 31, 2018." ECF No. 25-1 at 2. Any commission becomes due and payable "at the time of the applicable closing and only if the applicable property or business is purchased by [IFC]." ECF No. 25-1 at 3. The commission is the only compensation from IFC to CAG and Graham provided for by the Agreement. *Id.* at 2 ("In consideration of the services to be rendered by [CAG], [IFC] agrees to pay [CAG] the Commission amount, as applicable, as checked below.").

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 4

A previous draft of the agreement from approximately July 2017 provided a different definition of when the commission becomes payable:

> This commission shall be payable if [IFC] shall, during the term of this Agreement or within eighteen months after the Expiration Date or earlier termination, enter into a written purchase, option to purchase, or lease agreement for a property that [IFC] learned about during the term of this Agreement, regardless of whether [IFC] learned of the same through the efforts of [Graham], a third party, or through [IFC's] own efforts.

ECF No. 32-1 at 6.

In that unexecuted version of buyer agency agreement, the parties' agreement began on July 24, 2017, and expired on December 31, 2017. ECF No. 32-1 at 5.

On September 11, 2017, when CAG transmitted Exhibit A to IFC, CAG granted IFC "initial access to a relatively small set of data files for Project Victory." ECF No. 32 at 6. McKay recalled:

> Based on Mr. Graham's statements, I understood that CAG had received these data files from the Verbrugge and Larson families, two of the sellers, and that CAG had not compiled this information. The information provided in these data files was general in nature and included descriptions of the properties, spreadsheets showing how many acres of which fruit each orchard had, and other general business information. The information in these initial data files generally described the businesses, but it was insufficient for IFC to evaluate and analyze the suitability of [sic] feasibility of purchasing the assets, and IFC did not form a position based on these files. IFC did not rely on the information contained in these initial data files provided for Project Victory page [sic] in making the ultimate decision regarding purchase of the assets.

ECF No. 32 at 6.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 5

1    Once IFC executed Exhibit A on September 22, 2017, CAG transmitted a "Confidential Information Memorandum" ("CIM") to McKay later that day. ECF No. 32 at 7; *see also* ECF Nos. 33 at 4; 36 at 3. The CIM was prepared by Moss Adams Capital ("Moss Adams") and analyzed the assets comprising Project Victory, but which the CIM renamed "Project Crisp." ECF Nos. 32 at 7; 36 at 3. The CIM identified the three assets for sale, the same assets that had been identified as Project Victory. ECF Nos. 25-4 at 9; 32 at 7. The CIM provided that the sellers had approved the CIM and that the memorandum was "intended to assist investors in determining their interest in pursuing a potential [t]ransaction" with the sellers. *Id.*

McKay recounts that he immediately called Graham after reading the CIM and conveyed that he was "surprised and disappointed" to learn that Moss Adams was involved because McKay had thought that "IFC would be receiving exclusive information from [Graham and CAG] concerning the purchase opportunities, and that IFC would not have to go through a diligence and bidding process with multiple other prospective buyers or another brokerage firm." ECF No. 32 at 7.

According to McKay, Graham "explained . . . that Moss Adams was representing the sellers of the business assets and would be leading and coordinating the investment-bank led offering process and that the purchase opportunity would be made available to multiple prospective buyers, though he was not aware of other prospective buyers." ECF No. 32 at 7. McKay continued that "Graham also explained that Moss Adams would host and maintain a data room with additional

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 6

1  information about the assets offered for sale, including original company documents

2  and analyses of the businesses, and that this information would be available to all

3  prospective buyers." *Id.* at 7−8.

4        On September 23, 2017, McKay and Graham exchanged emails about their

5  phone conversation the previous day. ECF No. 25-6. Graham wrote, in relevant

6  part:

7      Wanted you to know I received this CIM package 10 minutes before I sent it to you. I don't believe many if anyone has it yet and I just
8      completed my agreement to get it. Again I have been 100% transparent and pushing to engage your company early in this deal. I look forward
9      to helping you with this great project.

10 *Id.* at 2.

11     McKay responded, in relevant part:

12     Thanks for the additional context today and yesterday. I hope I didn't offend you. When I saw the CIM I too wanted to immediately send it
13     off to my folks with some contextual comments so that's why I called you.

14

    One extremely good thing is that my entire team now believes the assets
15     are for sale which helps with dedicating staff time. Previous to the CIM and access to the data vault at least one of my guys questioned whether
16     this was even a live deal or not.

17 ECF No. 25-6 at 2.

18       In October 2017, McKay and Graham toured the orchard properties that

19 comprised Project Crisp. ECF No. 32 at 8. McKay also sent questions to CAG

20 regarding Project Crisp in late September and October 2017 and represents that he

21

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 7

received only "bits and pieces of information" that were "often stale and no longer useful or incomplete." *Id.* at 9.

In November 2017, Moss Adams granted IFC access to the Project Crisp data room hosted by Moss Adams. ECF No. 32 at 9. McKay and others at IFC heavily reviewed and analyzed the documents stored in the data room over the next several months. *Id.* at 8−9. McKay described the Moss Adams data room as "enormous," containing much more information that "was much greater in quantity, quality, and detail than the information provided by CAG." *Id.* at 9. McKay proffers that IFC based its decision to proceed with the Project Crisp transactions on the information provided in the Moss Adams data room. *Id.* at 10.

In approximately December 2017, CAG began interacting directly with Moss Adams or the Project Crisp sellers, without CAG's involvement as a conduit. ECF No. 32 at 10. McKay represents that he "kept CAG updated" regarding developments, such as when IFC submitted "Indications of Interest" to Moss Adams, but the exchange of information had reversed by the end of 2017 to the "IFC team . . . delivering information [they] had gathered on Project Crisp to CAG, rather than receiving information from CAG." *Id.*

IFC submitted a Letter of Interest ("LOI") directly to Moss Adams on February 16, 2018. ECF No. 32 at 11. McKay recalls that IFC relied on "information received from the CIM, the Moss Adams' data room and from interactions directly with the sellers and Moss Adams" to prepare the LOI. *Id.*

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 8

1    In spring and summer 2018, IFC held weekly in-person meetings with the
2    Project Crisp sellers, which CAG did not attend, and made "progress in its
3    information gathering efforts related to the Project Crisp portfolio . . . ." ECF No.
4    32 at 11. CAG and Graham dispute McKay's recollection of the infrequency of
5    the work performed by CAG and Graham on IFC's behalf during the duration of
6    the Agreement. *See* ECF No. 35 at 8.

7    On August 31, 2018, the Agreement expired, and IFC had not yet closed on
8    any of the businesses or properties identified in Exhibit A of the Agreement. ECF
9    No. 32 at 12.

10   In October 2018, Plaintiffs asked IFC to execute an addendum extending the
11   term of the Agreement. ECF No. 32 at 12. Around the time IFC was considering
12   whether to execute the addendum, McKay emailed a colleague:

> It seems our agreement with [CAG] may be [sic] expire before we close
> and that may put us in a position where we could try to renegotiate the
> broker fees we pay them. . . . I believe their fee is around $550K and
> they really didn't have to do much other than alert us to this deal,
> provide some initial information and persuade Moss Adams and Peter
> that we were legitimate purchasers. It would be poor form to
> renegotiate but this is a lot of money so it merits discussion.

17   ECF No. 25-22 at 2. IFC declined to execute the addendum. ECF No. 32 at 12.

18   Entities in which IFC has interests closed on their purchases of the Project
19   Crisp businesses or properties on or around December 20, 2018. ECF No. 32 at 13.
20   McKay further notes:

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 9

> Options to purchase certain parcels in the future were acquired as a part of the transactions. The value of these purchase options was reflected in the total purchase price of the assets. The time when the options can be exercised has not yet passed and will not occur for several more years. It is unknown whether those options will be exercised or what any potential future transaction would entail.

ECF No. 32 at 14−15.

The parties dispute the final purchase price, with CAG and Graham contending that it was $111,200,000.00, and IFC asserting that the purchase prices reflected in the three applicable purchase and sale agreements must be adjusted in accordance with the actual working capital of the assets purchased to arrive at a total purchase price of $106,489.168. *See* ECF Nos. 33 at 5; 36 at 6.

### ***Procedural History***

Plaintiffs filed this action on December 18, 2018, followed by amended complaints on January 10, 2019, ECF No. 3, and April 26, 2019, ECF No. 12. Plaintiffs pleaded a claim for a declaratory judgment as "persons interested under a written contract, or whose rights, status, or other legal relations are affected by a contract" under Revised Code of Washington ("RCW") 7.24.020. ECF No. 12 at 5−6. Plaintiffs also raised a claim for breach of contract based on Plaintiffs' allegations that Defendant failed to pay a commission and that Defendant breached the covenant of good faith and fair dealing "by failing to honor the terms of the Agreement, and in fact asking more of Plaintiffs than was required under the

Agreement, and then refusing to pay Plaintiffs for no reason other than the timing of Defendant's closing on the Property." ECF No. 12 at 9.

Defendant[1] answered Plaintiffs' Second Amended Complaint on May 10, 2019, and raised its own counterclaim for breach of contract, based on an allegation that Plaintiffs "failed to effect an off-the-market sale and/or to provide exclusive information and efforts to IFC . . . ." ECF No. 18 at 12.

Plaintiffs seek the following relief at summary judgment: (1) a declaratory judgment that Plaintiffs are entitled to commission payments; (2) a monetary judgment for Plaintiffs' damages from the unpaid commissions on the purchased assets, including interest, to the extent that the amounts are known; and (3) summary judgment dismissal of Defendant's counterclaim. ECF No. 24 at 6.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect

---

[1] To promote clarity, the Court does not refer to "Counterclaim Plaintiff" or "Counterclaim Defendants."

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 11

1    the outcome of the suit under the governing law." *Id.* "Factual disputes that are
2    irrelevant or unnecessary will not be counted." *Id.*

3      The moving party bears the initial burden of demonstrating the absence of a
4    genuine issue of material fact. *See Celotex*, 477 U.S. at 323. If the moving party
5    meets this challenge, the burden shifts to the nonmoving party to "set out specific
6    facts showing a genuine issue for trial." *Id.* at 324 (internal quotations omitted). "A
7    non-movant's bald assertions or a mere scintilla of evidence in his favor are both
8    insufficient to withstand summary judgment." *F.T.C. v. Stefanchik*, 559 F.3d 924,
9    929 (9th Cir. 2009). In deciding a motion for summary judgment, the court must
10   construe the evidence and draw all reasonable inferences in the light most favorable
11   to the nonmoving party. *T.W. Elec. Serv., Inc. v. Pacific Electric Contractors Ass'n*,
12   809 F.2d 626, 631–32 (9th Cir. 1987). Courts evaluate cross-motions for summary
13   judgment separately under the same standard. *Am. Civil Liberties Union of Nev. v.
14   City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003). If the non-movant's
15   opposition fails to cite specifically to evidentiary materials, the Court need not
16   search the entire record for evidence establishing a genuine issue of material fact or
17   obtain the missing materials. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026,
18   1028−29 (9th Cir. 2001); *Forsberg v. Pac. N.W. Bell Tel. Co.*, 840 F.2d 1409,
19   1417−18 (9th Cir. 1988).
20   / / /
21   / / /

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 12

# DISCUSSION

The central issue in this case is contract interpretation, and the parties agree that Washington law applies[2]. *See* ECF Nos. 31 at 4; 35 at 4. Washington case law prescribes an "objective manifestation" approach to contract interpretation. *Hearst Commnc'ns Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503 (Wash. 2005). The Court cannot look to extrinsic evidence to determine a party's unilateral or subjective intent as to the meaning of a contract term, to show an intention independent of the contract, or to vary or contradict the written language of the contract. *Hollis v. Garwall, Inc.*, 127 Wn.2d 683, 693 (Wash. 1999). However, the parties' intent is a "touchstone" of contract interpretation. *Tanner Elec. v. Puget Sound*, 128 Wn.2d 656, 674 (Wash. 1996). To ascertain the meaning of what is written in a contract, courts may look to "the subject matter and objective of the contract, all the circumstances surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties." *Berg v. Hudesman*, 115 Wn.2d 657, 667 (1990) (quoting *Stender v. Twin City Foods, Inc.*, 82 Wn.2d 250, 254 (Wash. 1973)). Courts must construe all contract provisions together and give effect to each part. *Diamond B Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App 157, 165 (Wash. App. Div. 1 2003).

---

[2] This matter is in this Court on diversity jurisdiction. ECF No. 1 at 2.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 13

At summary judgment, "[a] question of contract interpretation may be determined as a matter of law if it does not turn on the '"credibility of extrinsic evidence or . . . a choice among reasonable inferences to be drawn from extrinsic evidence."'" *Kofmehl v. Baseline Lake, LLC*, 177 Wn.2d 584, 594 (Wash. 2013) (alteration in original) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 668 (Wash. 1990) (quoting Restatement (Second) of Contracts § 212 (1981)).

In addition, the procuring cause doctrine provides a "default standard for liability to pay a commission where the parties have not agreed on a different standard, or where the parties' agreement as to when a commission will be paid proves ineffective." *Wash. Prof'l Real Estate v. Young*, 163 Wn. App. 800, 810 (Wash. Ct. App. Div. 3 2011) (citing *Willis v. Champlain Cable Corp.*, 109 Wn.2d 747 (Wash. 1988)), *reviewed denied*, 173 Wn.2d 1017 (2012). According to the doctrine, "when a party is employed to procure a purchaser and does procure a purchaser to whom a sale is eventually made, that party is entitled to a commission regardless of who makes the sale." *Id.* at 809. "The deal must be consummated within a reasonable time for the broker to be entitled to a commission." *Stabbert v. Global Explorer, LLC*, No. 66619-3-I, 2012 Wash. App. LEXIS 793, at *10 (Wash. Ct. App. Div. 1 Apr. 2, 2012) (citing *Thayer v. Damiano*, 9 Wn. App. 207 210−11 (Wash. Ct. App. Div. 3 1973)).

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 14

1    Parties may agree to a contract provision that provides for a commission

2    arrangement other than the default standard under the procuring cause doctrine. *Id.*

3    (citing *Prof'ls 100 v. Prestige Realty, Inc.*, 80 Wn. App. 833, 838 (Wash. 1996)).

4    ***Exclusive Information***

5    The Agreement at issue provides for Defendant to pay Plaintiffs a commission

6    upon purchase of covered businesses and properties "through the exclusive

7    information provided by and efforts of [Graham] for a business or property." ECF

8    No. 25-1 at 3. Plaintiffs interpret the phrase "exclusive information" to mean that

9    the information provided by Plaintiffs "would be information that Plaintiffs would

10   provide exclusively to IFC." ECF No. 35 at 9. Defendant, by contrast, maintains

11   that the "exclusive information" condition was not met because Defendant

12   purchased "the subject assets . . . through nonexclusive information provided by

13   Moss Adams (a different firm) made available to prospective buyers in a data room."

14   ECF No. 31 at 6.

15   Plaintiffs argue that the Court must interpret the contract to avoid rendering

16   any contract obligations illusory. ECF No. 35 at 4. Toward that end, Plaintiffs

17   maintain that the Court should look to Defendant's conduct after entering the

18   Agreement, as well as other surrounding facts, to ascertain that Defendant's

19   interpretation of "exclusive information" as meaning information unavailable to any

20   other potential buyer is unreasonable. *Id.* at 7. Plaintiffs argue that Defendant first

21   learned that the Project Crisp sellers had engaged Moss Adams to assist in the sale in

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 15

September 2017, but Defendant did not assert that Plaintiffs had breached the contract then and instead continued to work with Plaintiffs for the duration of the Agreement.  ECF No. 25 at 8.  Moreover, Plaintiffs assert that Defendant does not offer a reasonable interpretation of the term "exclusive information" because that interpretation would nullify Defendant's obligation to pay Plaintiffs a commission based on the actions of persons outside of Plaintiffs' control, such as sellers' decision to engage Moss Adams to assist in their side of the transaction or Defendant's decision to engage directly with Moss Adams and the sellers.  ECF No. 35 at 8−9.

Plaintiffs further argue that they are entitled to relief as the procuring cause of the sale of the Project Crisp properties to Defendant. ECF No. 24 at 9 (quoting *F.E. Ollinger Co. v. Benton*, 156 Wash. 308, 312−13 (1930)).  Plaintiffs argue that McKay himself acknowledged in September 2017, after Plaintiffs provided Defendant access to the CIM, Plaintiffs' data room, and the Moss Adams continuation of the data room, that his "entire team now believes the assets are for sale."  ECF No. 36 at 4 (quoting ECF No. 25-6).  Defendant argues that the procuring cause doctrine does not provide the standard for Defendant's liability for a commission because the parties agreed to a different standard, which includes the exclusive information condition.  ECF No. 31 at 13.

The term "exclusive information" is undefined in the parties' Agreement. Looking to "the subject matter and objective of the contract, all the circumstances

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 16

surrounding the making of the contract, the subsequent acts and conduct of the parties to the contract, and the reasonableness of respective interpretations advocated by the parties," as prescribed in *Berg*, 115 Wn.2d at 667, the Court finds questions of fact that preclude summary judgment in Plaintiffs' favor. McKay recites in his declaration that he asked Graham "multiple times" during their contract negotiation "if other brokers were or would be involved in the potential transactions, and he consistently responded 'No.'" ECF No. 32 at 4. McKay further declares, "He told me that because of his pre-existing relationship with the sellers, his experience, and industry expertise, he could provide IFC with valuable, exclusive information to help guide the diligence, valuation, and purchasing process." *Id.* Moreover, although Plaintiffs emphasize that Defendant did not immediately assert breach of contract after McKay became aware of the involvement of Moss Adams and other potential buyers, the Agreement allows for an inference that Plaintiffs could continue to provide information and make efforts on behalf of Defendant through August 31, 2018. ECF No. 25-1 at 2.

    Furthermore, the procuring cause doctrine provides a default, not mandatory, standard for what a broker must do to earn a commission, and the parties here expressed a different standard through the terms and conditions of the Agreement. *See Willis*, 109 Wn.2d 759 (declining to apply the procuring cause rule "to alter the terms of the contract and the parties' responsibilities under it.").

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 17

1    The choice between reasonable inferences to be drawn from the evidence
2    makes Plaintiffs' claim for a commission one that cannot be resolved as a matter of
3    law.  Rather, viewing the evidence in the light most favorable to Defendant, the
4    Court finds that the interpretation of the exclusive information condition could be
5    resolved in Defendant's favor if a factfinder were to find McKay credible.  *See*
6    *Kofmehl, LLC*, 177 Wn.2d at 594.  Plaintiffs are not entitled to summary judgment
7    on this basis.

8    ***Contract Expiration***

9    The Agreement provides that any commission "shall be due and payable at the
10   time of the applicable closing and only if the applicable property or business is
11   purchased" by IFC.  ECF No. 25-1 at 3.  The Agreement further provides that it
12   "shall commence on September, [sic] 1st 2017 and shall expire at 11:59 p.m. on
13   August, [sic] 31st 2018 (the "Expiration Date").[3]  *Id.* at 2.
14   Defendant argues that no closing had occurred by the time that the Agreement
15   expired on August 31, 2018, and "the Agreement did not contain a tail provision,
16   which would have extended the possible time a commission could be earned."  ECF
17   No. 31 at 11 (citing ECF No. 25-1 at 2).  Defendant points to extrinsic evidence that
18   it argues supports that the parties did not intend to include a tail provision that

---

[3] Even though the "Duration of Agreement" section defined the "Expiration Date" as a term of art, the term Expiration Date was not used again in the Agreement. ECF No. 25-1.

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 18

extended the payment obligation beyond the contract term. *Id.* at 11−12. Defendant further disputes whether the procuring cause doctrine applies to the contract expiration issue and argues that the contract drafting process illustrates that the parties deliberately did not include a tail provision in the Agreement. ECF No. 31 at 12.

Plaintiffs contend that Defendant's interpretation of the Agreement is unreasonable in that Plaintiffs "could fully perform within the period of the Agreement but nevertheless not be paid solely as a result of the closing date(s) agreed upon between the seller(s) and IFC." ECF No. 35 at 10. Therefore, Plaintiffs press the Court to interpret the contract in a manner that avoids rendering its terms illusory.

Again, the Court finds that a dispute of material facts precludes summary judgment for Plaintiffs. Whether or not there are emails evidencing a lengthy discussion about a tail provision, Defendant has shown that a previous iteration of the brokerage contract contained a tail provision, while the Agreement does not. ECF No. 32-1 at 6. The deletion of the tail provision from an earlier draft of the Agreement to the final draft of the Agreement supports Defendant's position that the tail provision was expressly excluded in the final Agreement. Plaintiffs do not question that they agreed to the terms of the Agreement. In addition, Plaintiffs' efforts to extend the Agreement with Defendant in October 2018 also undermines

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 19

Plaintiffs' argument that they are entitled to a commission if the purchase extended beyond the term of the Agreement, August 31, 2018. *See* ECF No. 25-22.

Therefore, the Court denies Plaintiffs' summary judgment motion. Accordingly, **IT IS HEREBY ORDERED**:

1. Plaintiff's Motion for Summary Judgment, **ECF No. 24**, is **DENIED**.

2. Having denied the Motion for Summary Judgment, ECF No. 24, the Court further resolves the parties' Stipulated Joint Motion to Amend Amended Jury Trial Scheduling Order, **ECF No. 42**. The Court **GRANTS IN PART** the Stipulated Joint Motion, **ECF No. 42**, with respect to extending the discovery cutoff in this matter **until June 19, 2020**, and the dispositive motion deadline until **July 10, 2020**. However, the Court **DENIES IN PART** the Motion, **ECF No. 42**, to the extent that it renders an October 19, 2020 trial date, and accompanying pretrial schedule, impracticable. The parties shall jointly submit two alternative proposed trial dates in January 2021 or February 2021 by **June 19, 2020**, based on which the Court will issue a Second Amended Jury Trial Scheduling Order.

**IT IS SO ORDERED**. The District Court Clerk is directed to enter this Order and provide copies to counsel.

**DATED** June 4, 2020.

*s/ Rosanna Malouf Peterson*
ROSANNA MALOUF PETERSON
United States District Judge

ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ~ 20